## JONES et al. v. OEMLER.

1. The State of Georgia, as owner of the beds of all tide-waters within its jurisdiction, has absolute power to sell or lease such beds, or any portion thereof, to any of its citizens upon any terms or conditions which its legislature may prescribe.

2. An attack upon the constitutionality of an act of the General Assembly, based on the grounds that "it contains matter different from

what is expressed in the title thereof, and refers to more than one subject-matter," without further specification, is too vague and indefinite for consideration by a court. The same is true of an attack alleging in general terms that the act "is invalid and unconstitutional."

3. Where an act which, among other things, prescribed "the method of lease of public domain within the State of Georgia for oyster planting, propagation, and cultivation," provided that a lessee should have "no authority to sublet or to assign his lease until after the expiration of five years from the date of his entry thereunder," and the act in question was subsequently amended by striking out the provision just referred to, it would then be the right of any lessee to assign his lease, as soon as he acquired the same; and this is true although a provision in the original act was left of force which declared, "that in the event the said lessee shall fail to comply with the requirements of [the law] as to the cultivation of said territory, he shall forfeit so much of said territory as has not been cultivated as hereinbefore required." In case of an assignment, the duty of complying with the provisions of the law would devolve upon the assignee, and in case of his failure to meet the legal requirements his right to the lease would be forfeited. But the right to proceed in courts to have such forfeiture declared vests in the State alone.

4. When a statute expressly declares that a specified chart made and published by the "United States Geodetic Survey" shall be conclusive evidence of the location of natural oyster-beds upon the coast of Georgia, and the State, in pursuance of such a statute, makes contracts with its citizens whereby it leases to them territory for oyster propagation, which, according to such chart, embraces no natural oyster-beds, such contracts are absolutely binding, and their validity can not be affected by the passage of a subsequent statute amending the former by striking therefrom the word "conclusive," or by parol evidence showing, or tending to show, that the territory in question did in fact embrace natural oyster-beds.

5. That unlawfully taking oysters from private beds held under laws from the State may be indictable and punishable under the criminal laws does not prevent the owner of such beds from enjoining insolvent persons from committing depredations thereon, when it is apparent that without such remedy the damage will be irreparable.

6. Under the evidence disclosed by the record, and in view of the law applicable thereto, there was no error in granting the injunction.

Argued February 19, — Decided March 8, 1900.

Injunction.   Before Judge Falligant.   Chatham county. December 2, 1899.

W. P. LaRoche and G. W. Beckett, for plaintiffs in error.

W. W. Gordon Jr., Gignilliat & Stubbs, and Barrow & Osborne, contra.

LEWIS, J.   Augustus Oemler brought suit in Chatham superior court against William Jones and others, about forty in number, for damages growing out of an alleged trespass by defendants on certain territory covered by Oyster creek and Shad river in the county of Chatham, which petitioner alleges he holds by virtue of certain leases made by the State of Georgia; and also for the purpose of enjoining defendants from further trespass upon the property.   The petition alleged that these leases were made under several acts of the legislature, including the act approved August 22, 1891, which acts were made a part of said leases, and conveyed to petitioner the exclusive privilege of bedding or planting oysters on the territory in question; that these leases were duly accepted, and large sums of money expended in planting oysters and cultivating the same, amounting to $10,000.   The lease contracts were made in the year 1892, and petitioner alleges that the lessees from the State, including petitioner, have, for over seven years, had possession, planted and cultivated these lands without molestation by any one, except occasional parties who had infringed the criminal laws in order to procure oysters at these points.   The effect of the cultivation and planting was to increase very largely the number of oysters in such territory; and the parties who failed to take out leases, or, having taken out leases, failed to cultivate them, have procured oysters wherever they could find them, and have so depleted the oyster-beds along the coast that the sources of supply have been reduced and limited practically to private beds planted by private parties.   This condition of affairs made it necessary for parties who had no such territory to take desperate measures in order to procure oysters for consumption and sale, and hence it was they would trespass from time to time on private beds; but finding the number secured in this way too small for their purpose, a combination was formed under color of the laws of the State leaving certain territory open to the citizens of the State.   To this end they combined and confederated together, and filed a bill against petitioner and others on September 25, 1899, asking for injunction and relief, and secured an order restraining petitioner from unlawfully interfering with the gathering by such conspirators of oys-

ters in the natural beds in the public streams, or upon the banks of public marshes in Chatham county. The parties exercised the greatest haste, after procuring such a restraining order, in getting oysters from petitioner's leased beds, and were engaged night and day in depleting these beds. They will continue these depredations, and petitioner will be unable to protect his rights accorded him by the State, and will be compelled to institute many prosecutions and civil suits to maintain his rights, and possibly forced to use violent measures to protect his rights, his property and his person, unless a court of equity affords some immediate and substantial relief. Petitioner further alleged that the defendants had already taken over four thousand bushels of oysters from his beds; that they were thoroughly and hopelessly insolvent, and had already damaged his property in the sum of $2,000; and would inflict infinitely more damage if permitted to continue their depredations. Petitioner prayed, among other things, that an injunction issue restraining the defendants from coming upon and into said territory, taking oysters therefrom, or in any manner interfering with said territory leased by petitioner. Judgment was also prayed for the sum of $5,000 damages inflicted by the defendants; and there was a prayer for general relief.

Upon this petition a temporary restraining order was granted, and at the June term, 1899, to wit, November 11, 1899, a hearing was had on said application. To the petition a demurrer was filed upon several grounds of a special nature, to the effect that the petition was insufficient in law, in that it did not set up sufficient facts to show that the oyster leases, if they ever existed, were still in force; it did not show that the lands covered by the waters of Oyster creek and Shad river did not contain natural oyster-beds; and did not show any lawful transfer of the leases covering said grounds, etc. This demurrer was met by an amendment to the petition, which amendment set forth particularly the acts of the legislature under which petitioner was claiming a lease to the land; that these leases were duly executed and delivered by the commissioners of Chatham county, in accordance with the act; that the leases made to Kayton and others were by them duly transferred to the Oemler Oyster Company,

a corporation under the laws of this State; that this company executed to Karow and Gordon a deed of trust covering all its property; that the company and these trustees conveyed to the Merchants National Bank and the Savannah Bank & Trust Co. all of the property of the Oemler Oyster Company, including the territory in said county leased from the State in Oyster creek and Shad river, and the oysters planted thereon; and on May 1, 1899, the Merchants National Bank and the Savannah Bank & Trust Co. conveyed by deed to petitioner, Augustus Oemler, the property in question held under the oyster leases. Petitioner further alleged, that more than 100 bushels of dead shells per acre were deposited upon each of the five-acre tracts that were originally leased within the first year; and in addition there had been planted over 100 bushels of oysters to every acre of planting-ground, at the rate of one acre or more each year, until each lot of five acres was planted. The amendment further alleged in detail that the conditions of the leases had been strictly conformed to by him and his predecessors in title. To the petition defendants filed an answer, alleging, in substance, that the plaintiff had no rights to the oyster-beds in question; that all the beds in Oyster creek and Shad river which are now there were there at the time of taking out the oyster leases, and have since remained, and still are natural oyster-beds, and, as such, free and open to all citizens of the State. They further denied that the leases were taken out under any act of the legislature, because the acts especially excepted from their operation the natural oyster-beds within the waters of this State. In short, the answer contained a specific denial of plaintiff's right to the oyster-beds in question, and asserted the right of defendants, in common with the public generally, to get oysters from the beds. After hearing the evidence, his honor Robert Falligant, judge of the court below, on December 2, 1899, filed his judgment granting a temporary injunction against the defendants as prayed for. To this judgment they except.

1. There can be no question that a State owns the beds of all tide-waters within its jurisdiction. It has as absolute jurisdiction and control over such territory as it has over any other property it may own. It has the same power to grant, sell, or lease

such beds, or any portion thereof, to any of its citizens, upon any terms or conditions which its legislature might prescribe, to the same extent that it would have the right to dispose of its wild or other lands which it owns. This fundamental principle, inherent in a sovereign power, we may say has been universally recognized by the learned law-writers and the courts, State and Federal, of this country. We deem it, in this connection, important only to cite a few of these numerous authorities on the subject. In the case of McCready v. Virginia, 94 U. S. 391, this doctrine of the ownership by a State, and its power over the beds of its tide-waters, is clearly recognized. Mr. Chief Justice Waite, in delivering the opinion in that case, on page 396 says: "The planting of oysters in the soil covered by water owned in common by the people of the State is not different in principle from that of planting corn upon dry land held in the same way. Both are for the purposes of cultivation and profit; and if the State, in the regulation of its public domain, can grant to its own citizens the exclusive use of dry lands, we see no reason why it may not do the same thing in respect to such as are covered by water. And as all concede that a State may grant to one of its citizens the exclusive use of a part of the common property, the conclusion would seem to follow, that it might by appropriate legislation confine the use of the whole to its own people alone." The case of the State of Alabama v. Harrub, 15 L. R. A. 761, was a prosecution under a statute prohibiting the shipment out of the State of oysters taken in the public waters of the State, and the taking of such oysters by any person who was not a resident of the State. It was held that the act was not unconstitutional as a regulation of interstate commerce. Coleman, J., delivering the opinion (pp. 763-4), makes this observation: "We think it further settled that the people of Alabama, through its legislature, alone have the power to dispose of their property rights in their oyster-beds and oysters, and if they see proper may dispose of them to their own people only. It is further settled that the legislature has ample authority to adopt all precautions and regulations deemed desirable or necessary for the preservation and increased production of its fisheries." It appears that in the State of Con-

necticut there are statutes regulating the designation of oyster-beds to any person for oyster culture.  Under a statute of 1875, selectmen of East Haven could designate for oyster culture ground in a certain part of the navigable waters within the town limits.  East Haven, at its town meeting, appointed a committee to designate the grounds within its limits, and the committee assumed to designate lands not within the part specified in section 1 of the act.  In 1877 a statute was enacted validating and confirming all designations made by authority of the town through its selectmen or oyster-ground committee.  In the case of State *v.* Bassett, 29 Atl. Rep. 471, the Supreme Court of Connecticut decided that the section under the latter act healed not only the errors of the committee, but the defects in their appointment.  That case was a prosecution of one for trespassing upon certain territory which had been designated and allotted to a Mrs. Foote, of the town of East Haven, for the purpose of planting oysters thereon, and in the designation the committee made a mistake, as above indicated.  The territory came by regular conveyances to the purchaser from the original grantee, who was in possession when the alleged trespass was made.  One of the grounds of defense was, that the designation was void, as originally made, because the place was a natural clam and oyster ground, which seems to have been excepted from being designated by the statute.  The action for trespass was sustained upon the theory that the error was remedied by subsequent legislation.

It was in the exercise of just such powers that the State of Georgia, through its legislature, in 1889 passed a law repealing various acts of the State with relation to oysters within its domain, and adopted a new system in reference to this matter.  See Acts of 1889, p. 143.  The title of that act recited the various acts which it repealed, " and, in lieu and place thereof," substituted " an act providing in what manner, at what seasons, and for what purposes oysters may be caught in the State of Georgia; the method of lease of public domain within the State of Georgia for oyster planting, propagation, and cultivation; the revenue to be paid therefor; the penalties for violations of this act; and for other purposes therein mentioned."

Under the provisions of section 7 of this act, the county commissioners of each of the counties named, which include Chatham county, or, where there is no board of county commissioners, the ordinary of such county, upon the application of any person for certain territory in any of the navigable waters of this State, and within a distance of one thousand feet from the shore, at ordinary mean low tide, upon satisfactory proof on hearing had before the county commissioners or ordinary that such territory has been duly staked off at the line of ordinary mean low tide, for a period of thirty days before the hearing of such application, shall execute a lease for twenty years, with a privilege of renewal for thirty years more, to such applicant as may first apply for such territory not already appropriated, where there are no natural public beds which have, prior to the applications, been resorted to by the public, for the purpose of procuring oysters with the use of tongs, for consumption or sale.　It was under the provisions of this act, as amended by the act approved September 22, 1891 (Acts of 1890-91, vol. 1. p. 214), to which particular reference will be hereinafter made, that leases during the year 1892 were duly granted by the proper authorities of Chatham county to divers parties.　Under these leases the petitioner asserts his rights in this case.

2. Upon the hearing, one ground of defense made in behalf of the plaintiffs in error was that the act of 1889, above cited, is unconstitutional, because "it contains matter different from what is expressed in the title thereof, and refers to more than one subject-matter."　Nothing appears in the record specifying or intimating in what particular the act contains any matter different from what is expressed in its title, nor in what particular it refers to more than one subject-matter.　Section 5527 of the Civil Code requires that the bill of exceptions shall specify plainly the decision complained of.　Under this rule of law, the bill of exceptions is manifestly too vague and indefinite for any consideration by this court of the constitutional question it undertakes to raise.　Not even in the argument of the case was any defect in the act pointed out upon which it was claimed that it was unconstitutional for the reasons stated. We will add, in this connection, that upon reading the title of

the act itself our conclusion is that it refers to but one subject-matter within the meaning of the constitution, and that it contains nothing different from what is covered by the very voluminous title thereto.    Another ground of defense alleged in the bill of exceptions is as follows: " That section vi of the act of 1891 is invalid and unconstitutional," and further, "That contracts based upon said section vi of the Acts of 1890-91, so far as the same makes Drake's Chart conclusive evidence of the existence or non-existence of oyster-beds, are void, and do not vest any rights in the lessee."    There is no specification whatever of what particular provision in the constitution the section in question violates.    No light has been given upon this subject, not even in the argument, nor can we conceive what constitutional requirement has been violated by the provisions of that section.    For the reason above indicated, this court can not consider the vague and indefinite ground of complaint.

3. The evidence introduced upon the trial fully sustains the allegations of the petition touching the leases in question. After the passage of the act of September 22, 1891 (Acts of 1890-91, p. 214), the record shows that applications were made by several parties to the proper authorities in Chatham county for leases, which were made to these parties by such authorities, after proceedings were had in conformity to the act in question. These beds thus leased were located in Oyster creek and Shad river in Chatham county; leases of them were made to various parties in January and February, 1892; the lessees, about May 22, 1892, transferred the leases to the Oemler Oyster Company; on June 30, 1892, this company conveyed its property to Karow and Gordon as trustees; and on August 4, 1893, the Oemler Oyster Company and these trustees conveyed the territory to the Merchants National Bank and the Savannah Bank & Trust Co.    On May 1, 1899, these banks conveyed the territory in question to Augustus Oemler, the defendant in error in this case.    Under section 8 of the act of 1889 (p. 146) it is provided that a lessee shall have no authority to sublet or to assign his lease until after the expiration of five years from the date of his entry thereunder; and it is further provided, that in the event the lessee should fail to comply with the require-

ments of this section as to the cultivation of said territory, he shall forfeit so much of said territory as has not been cultivated as hereinbefore required; and if the lessee shall at any time during the term of his lease abandon said territory, and cease to cultivate oysters thereon, for the space of one year, the lease shall be void, and the territory shall revert to the State. The evidence is uncontradicted that within the time, and according to the terms prescribed by the act, the lessees, or their assigns, had fully complied with the conditions named in this section of the act, and in fact had deposited the requisite bushels of shells and oysters, not only on every acre of planting ground, but upon the entire ground, within a year from the granting of the lease. It is contended by counsel for plaintiffs in error, that, under the provisions of that section of the act, it was the duty of the lessee to comply with these conditions before he had any power of transferring the property acquired by the lease. This provision of the act of 1889, prohibiting the original lessee from subletting or assigning his lease until after the expiration of five years from the date of his entry, was expressly repealed by section 3 of the act of 1891, by striking out the words, "provided further, that said lessee shall have no authority to sublet or assign his lease until after the expiration of five years from the date of his entry thereunder." Section 8 of the act of 1891 provides that nothing in the act "shall be construed to affect the titles of the lessees of oyster territory which has heretofore been leased by county commissioners or ordinaries, and all leases executed by them before the passage of this act, or any assignments which have been made of the leases of five (5) acre tracts are hereby confirmed and validated." By the repeal, therefore, of the restriction upon leases embodied in the act of 1889, it is quite manifest that the legislature intended the original lessees should have the power to sublet the property they have acquired at any time they saw proper; and this provision would necessarily apply to all transactions of this nature where the original leases, as in this case, were made after the passage of this amendatory statute. The act itself goes further in the last section cited, by ratifying and confirming transfers made by original lessees even prior to the passage of the act, which the legislature clearly had a right to do.

There is nothing in the record to indicate that any of the original lessees in this case had not done everything required of them by law, including the payment of the purchase-money for their property to the State, up to the time they sublet or conveyed what they had acquired, or were in possession of, to other parties. Anything else that remained to be done necessarily devolved upon the successors in title; and if these successors failed to comply with the conditions prescribed by law that would work a forfeiture, their right to the leases would terminate. As above stated, the evidence shows there has been no such failure on the part of the assignees, or the petitioner in this case. There can be no question about the general principle of law, that the right of disposal of any interest which one has acquired is an incident annexed to all property; and this right of alienation necessarily exists, although the title may be of an inchoate nature, unless there is some provision in the instrument or contract creating the title that especially and specifically prohibits such alienation. In the case of *Winter* v. *Jones,* 10 *Ga.* 181 (13), it was decided: "A purchaser of land from the State, by the act of entry and payment, acquires an inchoate legal title, which may descend, be aliened or divested, in the same manner as any other legal title." Lumpkin, J., delivering the opinion, says, "That the act of purchase transfers an immediate right of possession; and that the title, thus acquired, is sufficient to enable the purchaser to arrest an intruder by due course of law; and that the certificate which was required to be given, until the patent could issue, where the money was all paid, was evidence that the purchase was complete; and that by act of entry and payment of the purchase-money, the purchaser of land from the United States (and, I add, from each of the individual States) acquires an inchoate legal title, which would descend and might be aliened or sold under execution, as any other legal title." We therefore conclude that there is absolutely nothing in this record to authorize the inference that there has been any forfeiture whatever of these leases which were granted by the State. But suppose there had been, who has the power to institute proceedings to declare such a forfeiture? We think manifestly in this case no one but the State

itself. In the case of *American Mortgage Co.* v. *Tennille,* 87 *Ga.* 28-9, it was decided that "Under the act of February 28th, 1877, providing that the State of Georgia will not consent to foreign corporations owning 5,000 or more acres of land in this State unless they shall become incorporated under the laws of Georgia, the State alone can make the question as to the right of such corporations to hold said land." See the able opinion of Justice Lumpkin (now Presiding Justice) in that case, and authorities cited. In the case of *Norris* v. *Milner,* 20 *Ga.* 563, it was decided that a condition does not defeat the estate, although it be broken, until entry by the grantor or his heirs; and that a stranger can not take advantage of the breach of a condition in a deed. In the case of *Edmondson* v. *Leach,* 56 *Ga.* 461, it was decided: "An estate forfeited by breach of condition subsequent is not revested in the grantor until after entry or action brought by him or his heirs." In the case of *Van Wyck* v. *Knevals,* 106 U. S. 360, the question arose with reference to the forfeiture of a grant by the United States to a company, in consequence of the failure of the company to comply with its obligations under the contract. It was there decided that such a forfeiture could be enforced only by the United States through judicial proceedings, or the action of Congress; and that a third party can not set it up to validate his title. See also Sioux City Co. v. *Griffey,* 143 U. S. 32. Under these principles, then, we think it is quite manifest that even if there had been any failure on the part of petitioner in this case, or of any one of his predecessors in title under whom he claims, to comply with conditions or obligations which might work a forfeiture of the lease, only the State, acting in its sovereign capacity, as the representative of the entire people, could institute proceedings to bring about such a result, and to reclaim its lands. Certainly where such holders of an estate for years were in the quiet and peaceable possession of it under grant from the State, by the State's permission and consent, and after the State had accepted compensation therefor, and expended it for the public good (in this case the fund paid for the leases was appropriated for the purposes of public education), individuals could not trespass upon such property, and, in a suit brought against

them by one thus holding under the State, to prevent such trespass, could not defend by alleging that the plaintiff had forfeited his lease to the State.

4. By virtue of section 16 of the above-cited act of 1889, provision is made that the rights of any citizen of this State to enter upon and take from any public beds oysters by the use of such implements as may have been heretofore in general use in this State shall not be abridged or interfered with. One evident purpose of the act was to allow the public to use what was known as the natural oyster-beds that they had been in the habit of using, and that the leases should not cover territory of this character. The defendants' below claimed their right of entry upon the ground in question by virtue of such provision. We are not aware of any statute of the State, prior to the passage of the act of 1889, that specifically preserves such right; and in fact the defendants below rely upon that provision in the act of 1889, also recognized in the act of 1891. It is a little singular that they seek to have an act declared unconstitutional by virtue of the terms of which they justify their conduct complained of by the petitioner in this case. It will be observed that this act of 1889 did not provide any plan or scheme by which natural oyster-beds could be definitely distinguished from other territory covered by water, known as vacant lands, which the State had provided for leasing. Consequently great confusion seems to have originated, and great doubt and uncertainty necessarily existed, at times when leases were applied for on certain territory, as to whether or not there were located thereon the natural oyster-beds referred to by the statute. Under the act as it stood, such questions necessarily were to be decided and passed upon by the county authorities granting the leases, and it would seem that their adjudication should be considered as final, especially as to any contest of the kind brought before them. In consequence of this confusion, uncertainty, and the frequent contests which were likely to arise touching the rights of one who had acquired privileges in certain territory for planting and cultivating oysters, and the rights of the public in such territory, after the passage of the act of 1889 the same legislature adopted a resolution to the effect that the Governor be

requested to ask the Federal government to assist the State of Georgia in making a survey, as was done by the Federal government for the State of North Carolina, and to detail one or more officers of the U. S. Navy to make a physical examination of the waters of the State of Georgia, and prepare a chart showing in detail the productive and unproductive areas, as well as the natural oyster-beds. See Acts 1889, p. 1429. A survey for Georgia was accordingly made in compliance with this resolution, which included the territory involved in this litigation. Plats of these surveys were made, and a report of the result thereof was made by J. C. Drake, Ensign U. S. Navy, and Assistant U. S. Coast and Geodetic Surveyor. This report was introduced in evidence, and was known as "Bulletin No. 19." In it is a plat embracing the surveys about Savannah, in which was clearly indicated upon what portion of the territory were located natural oyster-beds, and what portion was vacant; the latter, under the act of the legislature, being clearly subject to lease to private parties, but the former not. By virtue of the act of September 22, 1891 (Acts 1890-91, vol. 1. p. 214), embodied in the Political Code, §1700, it was provided: "The natural oyster-beds of the State shall forever remain the property of this State, open to all her citizens for the procuring of oysters for consumption, sale, seed or propagating purposes; and for the better securing of this purpose, the charts made and published in consequence of a resolution passed by the legislature of this State, by United States Geodetic Survey known as 'Bulletin No. 19,' shall be conclusive evidence of the location of such natural oyster-beds and of vacant ground: *Provided,* that wherever beds, shown by said 'Bulletin No. 19' to be natural oyster-beds, shall as a matter of fact not extend below low-water mark, then the territory below low-water mark shall nevertheless be open to lease. Except as herein stated, it shall not be lawful for the county commissioners or ordinary to grant leases to any grounds shown on said 'Bulletin No. 19' to contain a natural bed, and it shall be lawful for them to grant leases on any or all territory indicated on said 'Bulletin No. 19' as vacant." The testimony in the record was uncontradicted that all the territory embraced by the leases involved in this contest was

indicated on said "Bulletin No. 19" introduced in evidence as being vacant land, no part of it containing natural oyster-beds.

We do not think there is any question about the power of the legislature to enact such legislation. Under the facts disclosed by this record, it was clearly a wise act to settle by legislation definitely in some way exactly what lands the county commissioners of Chatham county could lease, and exactly what they could not. A mere specification that vacant lands would be leased, and that natural oyster lands should not be, had given rise to confusion and uncertainty. The purpose of having these lands thoroughly surveyed by expert officials entirely competent to determine the distinction and the location of the two classes of territory mentioned was certainly a proper course to pursue under the circumstances. The object of this survey, and the object of the legislature in afterwards adopting it as conclusive evidence touching the character of the territory embraced therein was intended no more for the protection of the lessees of these lands than for the protection of the public as to their rights in these waters; and we think there can be no question about the right of the legislature to make such evidence conclusive. This principle was decided in White *v*. Petty, 18 Atl. Rep. 253, by the Supreme Court of Connecticut, where it was held: In a suit to restrain defendants from interfering with complainant's oyster grounds, the report of a committee, appointed under a certain law of Connecticut, to locate and describe all natural oyster-beds in a certain town, which did not include grounds in the town that had been designated to complainant, was admissible to rebut evidence that the grounds were, in 1886, and for ten years before, natural oyster grounds, as the statute provides that such report, when accepted and recorded, shall be conclusive, as to the extent of natural oyster-beds, at its date. The same principle is substantially announced in the case of State *v*. Nash, 25 Atl. Rep. 451, where it appears that a certain statute designated certain locations of natural oyster-beds. In a prosecution against a party for trespassing upon places that had been designated to private parties, it was held that the only evidence which could avail would be that the property in question was embraced in the locations and descriptions contained

in the statute and enumerated as natural oyster-beds. This is exactly the effect of our statute in question, for it adopts the United States survey made of this territory, states it is conclusive evidence, and thereby, by special statute, recognizes certain specific and definitely located property as natural oyster-beds, and certain other property as vacant land subject to be leased. State v. Bassett, 29 Atl. Rep. 471; Rollins v. Wright, 93 Cal. 395, deciding, in effect, that an act of the legislature providing that certain matters in a deed are conclusive evidence is valid and effective. See also the case of Abbott v. Lindenbower, 42 Mo. 162, where it was held that an act making the recitals in certain tax deeds conclusive evidence was valid and constitutional. To the same effect, see Marx v. Hanthorn, 30 Fed. Rep. 579; Ensign v. Barse, 107 N. Y. 329; DeTreville v. Smalls, 98 U. S. 517.

It was contended, however, by plaintiffs in error, that the provision in the act of 1891 making "Bulletin No. 19" conclusive evidence of the character of these lands is no longer of any force, for the reason that by the act of 1898 (Acts of 1898, p. 48) the act of 1891 was amended by striking therefrom the word "conclusive." There is nothing in the act making this amendment to indicate that it was intended to be retroactive in its effects. When such is the case, the usual rule of construction is to give such acts a prospective effect only. We think, therefore, it was the intention of the legislature that whatever effect striking the word "conclusive" may have been intended to have, it should apply only to leases, or other contracts with reference to oyster-beds, made and entered into after the passage of the act, and was not intended to affect in any way leases made by the State to individuals before the passage of this amendment and after the passage of the act of 1891. Were the intention otherwise, then we think the act would be obnoxious to that provision in the constitution embodied in the Civil Code, § 5730, in which it is declared that no ex post facto law, retroactive law, or law impairing the obligation of contracts, or making irrevocable grants of special privileges or immunities, shall be passed. See also the provision of the constitution embodied in the Civil Code, § 5936, where it is declared, in effect, that all rights, privileges,

etc., which may have accrued to any person or corporation, in his or their own right, or in any fiduciary capacity, under and by virtue of any act of the General Assembly, or any judgment, decree or order, or other proceeding of any court of competent jurisdiction in this State, heretofore rendered, shall be held inviolate by all courts before which they may be brought in question, unless attacked for fraud. It is true that acts purely of a remedial nature, and even acts amending the law upon the subject of evidence and the competency of witnesses, etc., may often constitutionally have retroactive effect; but this rule is made applicable only in such cases where such legislation does not have the effect of impairing any substantial right which had accrued and vested in a person by virtue of a valid contract made before the passage of the act. The leases in this case were granted by the State several years before the passage of the act of 1898. They were founded upon the provisions of the act of 1891; and the parties are presumed to have taken them and to have spent their money on their faith in the guarantee of the State, that the survey made by its direction should forever be conclusive evidence of the fact that the lands conveyed under the leases were vacant lands within the meaning of the act. The provision in the act of 1891 to which we refer necessarily constituted a part of the contract between the State and its lessees, and it could not have been more effectual or binding upon the State itself than it would have been had a grant been made with a plat attached, accurately locating the land, and definitely describing it by metes and bounds.

In fact the provision of the act of 1891 does something more than simply lay down a rule of evidence. In the last sentence of section 1700 of the Political Code, embodying this provision, it is expressly declared that while the county commissioners or ordinary shall not grant leases to any grounds shown on "Bulletin No. 19" to contain a natural bed, it shall be lawful for them to grant leases on any and all territory indicated on said bulletin as vacant. The State, therefore, by this provision adopted lands indicated on the chart to be vacant as the identical property which the county commissioners or ordinary had a right to lease; and the statute would not have been stronger

in its effect had a special law been passed describing this territory minutely and accurately, as it was in the chart or survey, and declaring to the county commissioners of Chatham county that they had authority to lease that land. Of course such a lease would have been binding upon the State, whether in point of fact there were any natural oyster-beds upon the land or not. Such an express provision would necessarily have been a change or modification of any general law that might have been in existence reserving any natural oyster-beds for public use; and the lessee and his assigns would have taken the property free from any such restriction, or free from any rights of individuals or the public to enter thereon. Now, to so construe the act of 1898 as to hold that it was retroactive in its effect, and applied to the leases in this case, and thus permit a party to go behind the chart, and show that in point of fact some of the territory was not vacant but contained natural oyster-beds, would be a direct violation and impairment of a solemn contract entered into between the State and some of its citizens. It would be allowing a party to show by parol testimony that the action of the county commissioners, in their judicial capacity, was absolutely void, notwithstanding when they acted they proceeded in direct obedience to a positive mandate of the State legislature, that mandate being expressed touching a matter over which the legislative department of the government had absolute control. We dare say that no respectable authority can be found in this country for the proposition that such a law, whether called a remedial statute, or a statute upon the admissibility of testimony in causes, could be retroactive, and could be so applied as to defeat the vested rights of a citizen. This principle is practically decided in the case of *Waters* v. *Dixie Co.*, 106 *Ga.* 592, where it was held: "When the lien of a materialman has, under the terms of the statute, become fixed and secured, such lien is then a vested right; and no subsequent repeal or modification of the act under which it became fixed can destroy or modify such right." Certainly the lien of the materialman in that case was not any more fixed, and not any more securely vested, than was the title to this land when the same was leased by authority of the State.

It really does not appear, however, from this record what the

ruling of the judge below was upon the subject of the effect and weight as evidence of this chart made by the United States survey, and we fail to find in the bill of exceptions any exception to any views entertained or judgment that may have been made by the court on this question. It is simply stated "That the law of 1898, amending the law of 1891, making Drake's chart conclusive evidence, is the law which regulates procedure in the courts of this State, in cases arising subsequent to the passage of said act of 1898, and the only recourse which the plaintiff has in a court must be had under the existing law regulating procedure." Nothing appears in the record indicating that there was any ruling by the judge to the contrary of this contention of counsel for plaintiffs in error. On the contrary, it appears from the brief of evidence that testimony was introduced in behalf of defendants below, tending to show that some of the lands claimed by petitioner under the leases had upon them natural oyster-beds. There was also evidence in behalf of petitioner proving the contrary; and the truth is, the only material conflict that seems to have existed in the testimony of the witnesses was in relation to the quantity of oysters that was upon the land in question at and before the granting of these leases. We think that the preponderance of evidence was decidedly with the petitioner in establishing the fact, that while there may have been, years before this lease, natural oyster-beds of advantage to the public in obtaining oysters, yet at the time of this lease, and for several years before, these beds had become so utterly depleted that even the public stopped resorting thereto for the purpose of getting oysters, either for consumption or sale; and that in point of fact, properly speaking, there are no natural oyster-beds anywhere upon these grounds. Simply because there has been at a certain place a natural oyster-bed which has become entirely depleted, it does not follow that such territory, which has only a few scattering oyster-shells about in places, is still an oyster-bed. In the case of State v. Willis, 10 S. E. Rep. 764, the Supreme Court of North Carolina decided: "A natural, as distinguished from an artificial, oyster-bed is one not planted by man, and is any shoal, reef, or bottom where oysters are to be found growing, not sparsely, or at intervals, but in a mass or

stratum, and in sufficient quantities to be valuable to the public."
Shepherd, J., in delivering the opinion in that case, enters into
quite an able and thorough discussion of what constitutes a nat-
ural oyster-bed, reaching the conclusion above quoted, from the
unanimous decision in the case by the court. Even, therefore,
if we are in error about the conclusiveness of the evidence
furnished by Drake's chart, we can not say that there was not
sufficient evidence, simply treating the chart and the action of
the county commissioners as only prima facie evidence, to au-
thorize the judge below to grant this temporary injunction.

5. It is further contended in behalf of plaintiffs in error,
that even conceding the conduct of the defendants in this case
was a trespass upon the property of petitioner, it then involved
the violation of a penal offense, and a court of equity has no ju-
risdiction to restrain a party from committing a crime. The
authorities relied on to sustain this position refer simply to such
criminal acts as involve only the public interests, and equity will
not interfere to restrain their commission, unless some private
right of property is being endangered and serious injury threat-
ened thereto, for which the owner has no adequate relief at law.
The fact that a trespass upon the property rights of others in-
volves also the violation of a public penal statute does, of course,
not prevent the owner of the property from appealing to the
courts for such redress as law or equity may give him. The acts
proved by the testimony in this case clearly show that the plain-
tiffs in error were trespassers upon the property of petitioner.
Even at common law such an action could be maintained to pro-
tect planted oysters. In the Court of Appeals of New York in
case of Post v. Kreischer, 8 N. E. Rep. 365, it was decided:
"Oysters planted in a bed clearly marked out in the tide-waters
of a bay or arm of the sea, where there are no oysters growing
spontaneously at the time, are the property of the person who
plants them, and the taking of them by another person is a tres-
pass, for which an action lies." See also Grace v. Willets, 14
Atl. Rep. 559, decided by the Court of Appeals of New Jersey,
in which it appeared that plaintiffs deposited in a certain river a
boat-load of oyster shells. To these shells the germs of oysters,
floating in these waters, attached themselves, and in about two

years developed into marketable oysters. It was held, that these oysters belonged to plaintiffs, and that they could maintain an action against the defendants for the removal and conversion of them. Certainly then, under the facts of this case, this defendant in error had such an interest in the property trespassed upon as to entitle him to maintain an action for trespass on account of the depredations which the evidence shows were made by these plaintiffs in error on his oyster-beds. It appears from the pleadings and the evidence that these defendants below were all insolvent; that they had combined in considerable numbers, and were committing continuous and repeated invasions upon petitioner's property, and before the filing of the petition had actually destroyed about $2,000 worth of property, by taking several thousand bushels of oysters from the beds of defendant in error; that this injury would continue unless the parties were restrained, and it was evidently irreparable in damages on account of the insolvency of the defendants below. Section 4916 of the Civil Code declares: " Equity will not interfere to restrain a trespass, unless the injury is irreparable in damages, or the trespasser is insolvent, or there exist other circumstances which, in the discretion of the court, render the interposition of this writ necessary and proper, among which shall be the avoidance of circuity and multiplicity of actions." In the case of *Cottle* v. *Harrold,* 72 *Ga.* 830, it was decided: " Equity will restrain a trespass when the threatened injury is irreparable in damages, or when the trespasser is insolvent, or when there exist other circumstances which, in the discretion of the court, render the interposition of the writ necessary and proper." See also *Peterson* v. *Orr,* 12 *Ga.* 464; *McGinnis* v. *Justices,* 30 *Ga.* 47; *Graham* v. *Dahlonega Co.,* 71 *Ga.* 297; *Smith* v. *Smith,* 105 *Ga.* 106; *English & Co.* v. *Jones,* 108 *Ga.* 123.

6. It is unnecessary to make further comment upon the character of the evidence introduced on the hearing of this application for temporary injunction. Every material allegation of fact in plaintiff's petition was substantially sustained by the overwhelming weight of testimony introduced on the trial. Under the evidence disclosed by the record, and in view of the

principles of law herein enunciated, there was no error in granting the injunction.

*Judgment affirmed. All the Justices concurring.*